# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

-----------------------------------------------------------

ARABIAN SUPPORT & SERVICES       :
COMPANY, LTD.,       :
       :
              Plaintiff,       :           Civil Action No.
       :             15-12951
         vs.       :
       :
TEXTRON SYSTEMS CORPORATION,       :
       :
              Defendant.       :
       :
       :

-----------------------------------------------------------

## COMPLAINT

Plaintiff Arabian Support & Services Company, Ltd. ("Plaintiff" or "ASASCO"), by counsel, and for its Complaint ("Complaint") against Defendant Textron Systems Corporation ("Defendant" or "TSC"), states as follows:

## INTRODUCTION

1.      This lawsuit arises out of Defendant TSC's deliberate interference with Plaintiff ASASCO's right to certain payments arising out of TSC's sale of military hardware to the Kingdom of Saudi Arabia ("KSA" or "Saudi Arabia").

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 based on diversity of citizenship.  Defendant is a citizen of Massachusetts and Delaware, and Plaintiff is a citizen of the Kingdom of Saudi Arabia.  The amount in controversy exceeds $75,000.

3.      Venue is proper under 28 U.S.C. § 1391(a).

## THE PARTIES

4.      Plaintiff Arabian Support & Services Company, Ltd. ("ASASCO") is a company organized under the laws of the Kingdom of Saudi Arabia and is duly organized to conduct business there.  ASASCO is a leading defense and aerospace consultant with over 30 years of experience doing business in Saudi Arabia.  It has provided consultation services in Saudi Arabia on behalf of many of the world's largest and most respected private defense firms, including Lockheed Corporation, BAE Systems, Inc., Aerospatiale of France, and Thomson CSF (a French company now known as Thales Group).

5.      Defendant Textron Systems Corporation ("TSC" or Defendant) is a Delaware corporation headquartered at 201 Lowell Street, Wilmington, Massachusetts 01887.  Its registered agent for service of process is CT Corporation System, 155 Federal Street, Suite 700, Boston, Massachusetts 02110.  TSC is an American defense firm whose origins trace back over 80 years.  TSC, a division of Textron Inc., generates earnings north of $1 billion annually.

6.      Non-party Blenheim Capital Partners, Ltd. ("Blenheim") is, upon information and belief, a company organized under the laws of the United Kingdom headquartered in London, England.

**FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

7.      As set forth more fully herein, TSC orchestrated and arranged for TSC, Blenheim and ASASCO to enter into two separate but related contractual relationships whereby ASASCO would be entitled to substantial lawful payments arising out of the sale of TSC's military hardware in Saudi Arabia.  Specifically, Blenheim and TSC entered into an agreement titled Offset Services Agreement on or about February 6, 2008 (the "Offset Services Agreement").  Plaintiff ASASCO is an express, intended third-party beneficiary of the Offset Services Agreement.  ASASCO and Blenheim then entered into an agreement on April 6, 2009 whereby

2

ASASCO was to service the Offset Services Agreement ("Blenheim-ASASCO Agreement") and, as payment therefor, receive 75 percent of any funds TSC paid Blenheim under the Offset Services Agreement.  As discussed below, TSC was the primary architect of this contract structure among TSC, ASASCO and Blenheim.  TSC orchestrated and participated in the negotiations giving rise to these two agreements, and then deliberately and wrongfully thwarted ASASCO's right to its lawful fee pursuant to the arrangement.

8.     Since early 2000, ASASCO served as the sole consultant for TSC in Saudi Arabia. ASASCO, in good faith, performed extensive work on TSC's behalf as TSC's consultant.

9.     In this role, among other things, ASASCO assisted TSC for over ten years in connection with TSC's efforts to market and sell sensor-fused weapons systems known as SFW-105 or CBU-105 to the Saudis by, *inter alia*, (a) arranging meetings with key Saudi officials, (b) utilizing ASASCO's relationships within the Royal Saudi Air Force ("RSAF") to lobby on behalf of TSC, (c) assisting TSC in  preparing Arabic translated letters, presentations, providing logistical support for TSC officials in Saudi, (d) providing TSC with key intelligence regarding important personnel and other developments in the Saudi government and military, and (e) identifying and presenting TSC  with numerous business opportunities in Saudi Arabia.

10.     The CBU-105 is more commonly known as a "Cluster Bomb Unit," or "CBU." The general public would recognize the CBU-105 generically as "cluster bombs."  TSC describes the CBU-105 as "[a] 1,000-pound class weapon" which contains submunitions resembling hockey pucks known as "Skeets" that detect and destroy targets, such as tanks and armored personnel carriers. Although human rights groups have criticized the use of cluster bombs because of their claimed effects on civilian populations, TSC boasts that the CBU-105

"exceeds stringent U.S. Department of Defense policy on multiple warhead systems by regulating unexploded ordnance (UXO) to less than 1 percent."

11.     Successfully marketing and securing the sale of military hardware to Saudi Arabia requires an intimate knowledge of Saudi culture and politics.  ASASCO and its Founder and Executive Director, Mansour Al-Tassan, have cultivated relationships in the ruling family, Saudi's military command, and government for decades, making ASASCO particularly well-suited for this task.  Indeed, this is precisely why TSC retained ASASCO to serve as its exclusive consultant in KSA.

12.     ASASCO's efforts on behalf of TSC to secure a deal on behalf of TSC between KSA and TSC for the sale of the CBU-105 extended for over a decade.  These efforts were, by all accounts, essential to Textron's success in ultimately securing sales commitments with KSA worth as much as over $1 billion in December 2011.

13.     It has been reported by the *New York Times*, CNN and other news outlets that KSA has successfully deployed and used these cluster munitions sold to it by TSC in recent weeks in the course of its military campaign against Houthi rebels in Yemen's northern Saada Province.  *Saudi-Led Group Said to Use Cluster Bombs in Yemen*, The New York Times, May 3, 2015.

14.     To secure ASASCO's much-needed support in Saudi Arabia, TSC promised ASASCO that it would be paid a percentage of the total value of any eventual CBU-105-sale to KSA.  On September 28, 2004 at a meeting held in the Four Seasons Hotel in Cairo -- long before TSC and KSA finalized the CBU-105 sales deal -- Mr. Avo Boyamian, TSC's Director of Business Development, Middle East Region, and ASASCO's primary point of contact at TSC, informed Mr. Al-Tassan that TSC intended to pay ASASCO approximately 5 percent of the total

value of the CBU-105 sale.    Mr. Boyamian was based and maintained an office in Massachusetts.   Consequently, many (if not most) of Mr. Boyamian's communications to ASASCO emanated from Massachusetts.

15. According to Mr. Boyamian, TSC had conferred with its counsel on the matter, who informed TSC that any payment to ASASCO should be structured so as to fully comply with U.S. Government regulations. According to Mr. Boyamian, TSC anticipated that Saudi Arabia would purchase approximately 1,000 units at $519,000 per unit resulting in a total payment to ASASCO exceeding $50 million.

16. During this same meeting, Mr. Boyamian disclosed that TSC had discussed with its counsel several ways to accomplish further payment to  ASASCO while remaining compliant with applicable laws and regulations, including, *inter alia*, by paying ASASCO a monthly retainer of between $120,000 and $150,000 for a period of time to cover the whole fee or at least a portion of it and/or arranging for ASASCO to benefit from business arising out of the Iraq War or the sale of other military hardware.

17. On November 6, 2004, Messrs. Boyamian and Al-Tassan met again, this time at ASASCO's offices in Saudi Arabia.  During this meeting, Mr. Boyamian informed Mr. Al-Tassan that TSC anticipated that, in connection with the sale of the CBU-105 to KSA, Saudi Arabia would require that TSC satisfy what are known as "offset requirements."  According to Mr. Boyamian, TSC decided it would utilize these offset requirements as the vehicle to facilitate a lawful fee payment to ASASCO.

18. Offset agreements are most often imposed on U.S. or other multinational firms as a condition of executing a foreign military sale.  Pursuant to an offset agreement imposed on the transaction by the purchasing foreign state, the U.S. firm is required to invest a percentage of the

value of the foreign military sale in the purchasing foreign state – here, Saudi Arabia. Investment pursuant to an offset agreement can come in many forms, including investment into manufacturing projects, emerging technologies, and the purchase of goods.  In the case of an "offset waiver" by the purchasing foreign government, no investment is required.

19.     Reasonably relying on Mr. Boyamian's promises that TSC would make further payment to ASASCO, Mr. Al-Tassan agreed ASASCO would  enter into a written consultancy agreement with TSC.  The first written consultancy agreement was entered on or about March 1, 2005.  It was renewed annually and modified over time**.** Collectively, these written agreements shall be referred to as "Consultant Agreements."

20.     Over the course of ASASCO's relationship with TSC, the Consultant Agreements were modified from time to time.  At one time, it set ASASCO's compensation at $10,000 per month for its representation of TSC.  However, during the last several years of ASASCO's representation of TSC, TSC induced ASASCO to reduce its fee to $500 per month – a mere pittance for the value of the services ASASCO was providing to TSC – by continuing to promise ASASCO that ASASCO would benefit financially from either the imposition or waiver of offset requirements by KSA resulting from the CBU-105 sale.

21.     Emails between TSC and ASASCO reveal that TSC continuously and repeatedly assured ASASCO  that (a) TSC's agreement with KSA would create offset obligations for TSC unless those obligations were waived by KSA, and, in either case, (b) TSC would use its offset obligations or the waiver of those obligations as a vehicle by which ASASCO would be fairly compensated for its extensive efforts on behalf of TSC, without which TSC's lucrative sale of the CBU-105s to KSA would not have been achieved.

22.     For example, in or around May of 2006, Mr. Al-Tassan wrote to Mr. Boyamian to confirm the objectives and structure of the ASASCO-TSC offset arrangement and invited TSC to respond and comment.  Among the objectives Mr. Al-Tassan identified was TSC's desire to lawfully facilitate further payment to ASASCO for its efforts to procure a CBU-105 sales contract on behalf of TSC.  Mr. Tom Harrington at TSC responded with comments on behalf of TSC and did not dispute that it intended to utilize its offset obligations as a vehicle by which to further compensate TSC.

23.     By an email dated November 11, 2008, Mr. Boyamian of TSC informed Mr. Al-Tassan that it was his understanding that "Textron will be paying 8%" of the contract value" to an escrow account to meet its offset obligations, of which ASASCO would be entitled to seven-eighths -- as much as $70 million.

24.     On June 19, 2006, Mr. Avo Boyamian transmitted a draft offset agreement between ASASCO and Textron to Mr. Al-Tassan via an email copied to Mr. Neal Rutter, then TSC's Offset Manager.

25.     Shortly thereafter, however, TSC introduced non-party Blenheim into the offset discussions between TSC and ASASCO.  Blenheim is a well-known offset consultancy company, and TSC intended for Blenheim to serve as the vehicle whereby TSC would compensate ASASCO for its successful track record on behalf of TSC.

26.     On or about October 16, 2006, representatives of TSC, Blenheim and ASASCO met in Paris to discuss the issue of offsets.   From October 2006 through March 2009, Blenheim and ASASCO negotiated the Blenheim-ASASCO Agreement with TSC's encouragement and active participation.  Specifically, TSC arranged and participated in meetings, communicated directly with Blenheim and ASASCO regarding the status of negotiations, pressed Blenheim at

times when negotiations lost momentum, reviewed drafts of proposed agreements, and facilitated ASASCO's and Blenheim's agreement on the core terms of the arrangement.

27.    Between October of 2006 and continuing through December 2008, Neil Rutter (along with others at TSC)  took a central role in the Blenheim-ASASCO contract negotiations. Effective January 1, 2009, Mr. Rutter resigned his post at TSC, joined Blenheim as its president, continued his involvement in Blenheim's and ASASCO's negotiations on the side of Blenheim.

28.    On February 8, 2008, TSC and Blenheim entered into an agreement titled "Offset Services Agreement."

29.    On April 6, 2009 well over two years after the initial meeting in Paris in October of 2006, Blenheim and ASASCO finalized and entered into a subcontract agreement whereby ASASCO would service TSC's offset requirements in KSA ("Blenheim-ASASCO Agreement"). The Blenheim-ASASCO Agreement never would have been consummated without TSC's active involvement in the negotiations.

30.    The Offset Services Agreement, which is part of the two-contract structure TSC arranged and designed for purposes of ensuring ASASCO would be appropriately compensated, provides that any disputes thereunder shall be governed by the laws of, and adjudicated in the courts of, the Commonwealth of Massachusetts.

31.    As was contemplated during negotiations, the structure of the offset arrangement under the Blenheim-ASASCO Agreement was as follows:

        a.    ASASCO, a known, intended and expressed beneficiary of the TSC-Blenheim Offset Services Agreement, would service TSC's offset requirements arising out of the anticipated cluster-bomb sales agreement with KSA with funds totaling 75 percent of the value of all of those offset requirements.

8

b.  In the event that the offset obligation under the TSC-KSA sales contract was waived, TSC would pay Blenheim a fee fixed as a percentage of the value of the sales contract (that is, the amount it would otherwise have been required to utilize for an approved offset project), 75 percent of which would then be payable to ASASCO, which ASASCO would keep.

32.     The Blenheim-ASASCO Agreement further provides that all funds paid to Blenheim by TSC shall be deposited directly into an escrow account to be disbursed in accordance with Blenheim *and ASASCO's* written instructions.  Indeed, the Blenheim-ASASCO Agreement specifically sets forth that "the Offset Services Agreement [between Blenheim and TSC] will provide that TSC will pay all fees directly to the escrow account" opened by Blenheim and ASASCO.

33.     After the Blenheim-ASASCO Agreement was entered, the parties and Blenheim continued discussing the topic of offsets after the Blenheim-ASASCO Agreement.  On multiple occasions, TSC confirmed with ASASCO TSC's need to fulfill offset requirements in connection with its anticipated sale of cluster bombs to KSA.  To confirm this point, on December 21, 2009, Mr. Boyamian transmitted to Mr. Al-Tassan a copy of a letter transmitted by His Royal Highness Sultan Bin Abdulaziz, then Minister of Defense, Aviation & General Inspectorate for KSA, to the Chief of General Staff of the Saudi Armed Forces.  By this letter, the Minister of Defense confirmed that "Economic Offset shall be applied" to all military contracts with foreign firms "with value exceeding 400 million Riyals," or approximately $100 million.  It was known and understood by all that any sales contract between KSA and TSC would far exceed this threshold value, thus implicating KSA's offset requirement.

34.    By the Spring of 2011, despite ASASCO's repeated efforts to coordinate and communicate with Blenheim on the subject of offsets, Blenheim ceased its communications with ASASCO and failed to respond to offset proposals ASASCO made.  ASASCO raised the issue of Blenheim's unresponsiveness directly with TSC, and TSC mollified ASASCO's concerns by assuring ASASCO that its role in the offset arrangement was secure.  Thereafter, TSC and ASASCO dealt with each other directly on the issue of offsets.

35.    On December 24, 2011, TSC and KSA executed a letter of agreement whereby KSA agreed to purchase CBU-105D/B Sensor Fused Weapons.  On January 4, 2012, Mr. Boyamian emailed Mr. Al-Tassan, a congratulatory note:  "Our brothers in Saudi Arabia, signed the LOA on December 24, 2011 at the Christmas eve, as a Christmas gift to us.  CONGRATULATIONS TO ALL OF US."  (Emphasis in original.)  Mr. Al-Tassan responded:  "I am pleased that we at ASASCO [have] given you our in-country support and I certainly appreciate working with you towards our common goal."

36.    After TSC and KSA executed the December 24, 2011 letter of agreement, ASASCO continued providing support to Textron by, *inter alia*, arranging meetings for TSC officials with high-ranking officials in the Royal Saudi Air Force ("RSAF"), providing logistical support to TSC in Saudi Arabia, and informing TSC of key developments, including of business opportunities and personnel shake-ups within the Saudi government and its military ranks.

37.    On information and belief, by December of 2011 or shortly thereafter, TSC understood it did not intend to follow through on its commitment to compensate ASASCO through the TSC-Blenheim-ASASCO offset arrangement.  Still, it failed to inform ASASCO of this material fact and, instead, persisted in its offset-related discussions with ASASCO thereby causing ASASCO to continue to expend substantial efforts on TSC's behalf.  ASASCO's

decision to mislead TSC was made by its agents in, and its communications with ASASCO on the subject of offsets originated in, the Commonwealth of Massachusetts.

38.     In or around August of 2013, the Saudis and TSC finalized an agreement whereby KSA was to purchase over 1,000 cluster bombs from TSC ("TSC-KSA Sales Contract"). According to a report published by Reuters, the final deal was "valued at $641 million" for the delivery of "1,300 cluster bombs for Saudi Arabia."

39.     On August 29, 2013, nine days after TSC executed its sales agreement with KSA for the sale of the CBU-105s, Heather Whynot, TSC's International Compliance Analyst based at Textron's headquarters in Wilmington, Massachusetts, notified ASASCO that TSC would not renew its consultant relationship with ASASCO, which was set to expire on August 31, 2013.

40.     Mr. Boyamian at TSC later informed Mr. Al-Tassan of ASASCO that TSC had negotiated or was in the process of negotiating a further sale of CBU-105s to KSA, thus bringing the total value of the TSC-KSA sale to at least $1 billion.

41.     After the TSC-KSA Sales Contract was finalized and TSC notified ASASCO that it would not renew the latest of the Consultant Agreements, Mr. Al-Tassan reached out to Mr. Boyamian to inquire as to the status of the benefits promised to him as a result of the Offset Services Agreement and Blenheim-ASASCO Agreement.  Mr. Boyamian informed Mr. Al-Tassan that TSC made a substantial payment directly to Blenheim and terminated the Offset Services Agreement.

42.     TSC paid Blenheim directly in breach of the Offset Services Agreement's requirement that any such payments be made to an escrow account, thereby purposely depriving ASASCO of any payment to which it was entitled because doing so enabled TSC to retain more of the TSC-KSA sales contract value.  Further, a direct payment to Blenheim permitted

Blenheim to usurp any contractual obligation it had to pay a contractual portion of this fee to ASASCO.   On information and belief, TSC's decision to terminate the Offset Services Agreement and transmit a payment directly to Blenheim was made and carried out by TSC's agents in the Commonwealth of Massachusetts.

43.     Upon information and belief, TSC improperly terminated the Offset Services Agreement for the purpose of (a) depriving ASASCO of the payment to which it was entitled under the Blenheim-ASASCO Agreement, thus (b) permitting TSC to retain more of the TSC-KSA Sales Contract value.

44.     During the meeting referenced in Paragraph 42, above, Mr. Boyamian promised Mr. Al-Tassan that ASASCO's anticipated offset-related compensation would not be affected and that TSC would "find another way" to effect payment to ASASCO. Said another way, according to Mr. Boyamian, ASASCO would be compensated for the successful sale of the TSC CBU-105 weapons system to Saudi Arabia.

45.     To that end, Mr. Boyamian facilitated Mr. Al-Tassan's introduction to another individual, Jim Greenberg, an American consultant residing in Bahrain (Mr. Jim Greenberg). Mr. Boyamian indicated to Mr. Al-Tassan that Mr. Greenberg is a partner with the former head of the Saudi Economic Offset Secretariat.   Thereafter, Messrs. Boyamian, Al-Tassan and Greenberg engaged in communications and meetings, but nothing further materialized.

### COUNT I:  BREACH OF CONTRACT – THIRD-PARTY BENEFICIARY

46.     Plaintiff repeats and realleges each and every allegation set forth in Paragraphs 1 through 45 as if fully set forth herein.

47.     The Offset Services Agreement constitutes a valid and existing contract between Defendant TSC and non-party Blenheim.  Plaintiff ASASCO is an intended, expressed third-

party beneficiary of that agreement, which required TSC to deposit any payment it made to Blenheim directly into an escrow account held for the benefit of Blenheim and Plaintiff.

48.    Defendant TSC breached its third-party contractual obligation to Plaintiff ASASCO by remitting a payment directly to Blenheim thereby depriving ASASCO of 75% of that payment.  Thus, as a result of TSC's breach, Plaintiff ASASCO has been damaged and injured.

WHEREFORE, Plaintiff ASASCO requests that judgment be entered against Textron Systems Corporation as follows:

A. Awarding Plaintiff compensatory damages, in the amount of at least $10,000,000, or such other amount as may be proved at trial; and

B. Awarding Plaintiff such pre-judgment interest, post-judgment interest, reasonable attorney's fees, costs incurred and such other and further relief as the Court may deem just and appropriate.

## COUNT II – TORTIOUS INTERFERENCE

49.    Plaintiff repeats and realleges each and every allegation set forth in Paragraphs 1 through 48 as if fully set forth herein.

50.    Plaintiff ASASCO maintained a business and contractual relationship with non-party Blenheim.

51.    This relationship was known to Defendant TSC.  In fact, as set forth above, TSC was instrumental in forging the relationship and negotiating the contract that governed it.

52.    Defendant TSC interfered with Plaintiff ASASCO's business and contractual relationship with non-party Blenheim by, *inter alia*, improperly terminating the Offset Services Agreement with Blenheim and remitting a substantial termination payment directly to Blenheim.

53.     Defendant TSC did this wrongfully, intentionally, without justification for, and with the purpose of (a) depriving Plaintiff ASASCO of the funds it was owed under the Blenheim-ASASCO Agreement so (b) Defendant TSC could retain most or all of those funds itself.  TSC's interference enabled it to conclude its lucrative deal with the Saudi government without having to pay the Saudi entity (Plaintiff) without whose years of effort, the deal would not have been concluded.

54.     By tortiously and improperly interfering with Plaintiff ASASCO's then-existing business and contractual relationship with non-party Blenheim, Defendant TSC proximately caused injury and damages to Plaintiff TSC.

WHEREFORE, Plaintiff ASASCO requests that judgment be entered against Textron Systems Corporation as follows:

A.  Awarding Plaintiff compensatory damages, in the amount of at least $10,000,000, or such other amount as may be proved at trial; and

B.  Awarding Plaintiff such pre-judgment interest, post-judgment interest, reasonable attorney's fees, costs incurred and such other and further relief as the Court may deem just and appropriate.

### COUNT III – VIOLATION OF MASSACHUSETTS GENERAL LAWS, CHAPTER 93A

55.     Plaintiff repeats and realleges each and every allegation set forth in Paragraphs 1 through 54 as if fully set forth herein.

56.     Defendant TSC is headquartered in, registered to do business in, and engages in substantial trade and commerce within the Commonwealth of Massachusetts.  Defendant's decisions with respect to its improper termination of the Offset Services Agreement were made and carried out by TSC's agents in the Commonwealth of Massachusetts.

57.     Throughout ASASCO's relationship with TSC, ASASCO provided monthly reports with regard to ASASCO's efforts on TSC's behalf to TSC in the Commonwealth of Massachusetts.

58.     Plaintiff's primary point-of-contact at Defendant, Avo Boyamian, maintained an office and was based in the Commonwealth of Massachusetts.   Defendant, through Mr. Boyamian and other employees and agents, routinely communicated with Plaintiff from the Commonwealth of Massachusetts.

59.     Moreover, Defendant tortiously interfered with Plaintiff by improperly terminating the Offset Services Agreement, which provides that any disputes thereunder shall be governed by the laws of, and adjudicated in the courts of, the Commonwealth of Massachusetts.

60.     Defendant's conduct as outlined in this Complaint, including, but not limited to, as set forth in Paragraphs 37, 39, 41-45 and in Count II, above, constitutes unfair and deceptive conduct against Plaintiff.

61.     Such conduct was knowingly and willfully carried out by Defendant in an unfair, unethical, oppressive or unscrupulous manner from within Massachusetts.

62.     Plaintiff has been damaged and continues to be damaged through loss of money and property by Defendant's unfair and deceptive conduct.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendant as follows:

A.  Awarding Plaintiff compensatory damages, in the amount of at least $10,000,000, or such other amount as may be proved at trial; and

B.  Awarding Plaintiff treble damages and reasonable attorney's fees pursuant to Massachusetts General Laws, Chapter 93A;

    C.  Awarding Plaintiff such pre-judgment interest and post-judgment interest and such other

and further relief as the Court may deem just and appropriate.


Dated: July 15, 2015                      Respectfully submitted,


                                    MANION GAYNOR & MANNING


                                    /s/  Martin F. Gaynor III
                                    Martin F. Gaynor III
                                    21 Custom House Street
                                    Boston, Massachusetts 02110
                                    617 670 8800 (t)
                                    617 670 8801 (f)
                                    mgaynor@mgmlaw.com


                                    Of Counsel:

                                    KALBIAN HAGERTY LLP

                                    /s/ Haig V. Kalbian
                                    Haig V. Kalbian (*Pro Hac Vice Pending*)
                                    Aaron W. Knights (*Pro Hac Vice Pending*)
                                    D. Michelle Douglas (*Pro Hac Vice Pending*)
                                    888 17th Street, N.W., Suite 1000
                                    Washington, D.C. 20006
                                    (202) 223-5600 (t)
                                    (202) 223-6625 (f)
                                    hkalbian@kalbianhagerty.com
                                    aknights@kalbianhagerty.com
                                    mdouglas@kalbianhagerty.com