UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-12951-RGS

ARABIAN SUPPORT & SERVICES COMPANY, LTD.

v.

TEXTRON SYSTEMS CORPORATION

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND RENEWED MOTION TO DISMISS

March 11, 2016

During the relevant times, Arabian Support & Services Company, Ltd. (ASASCO) was a consulting firm based in Riyadh, Saudi Arabia.[1] ASASCO held itself out as a facilitator of munitions sales to the Saudi government. Textron Systems Corporation, a major U.S. defense contractor, is a Delaware corporation with a business presence in Massachusetts. Blenheim Capital Partners, which is not a party to the lawsuit, is a United Kingdom consultancy that formulates "offset solutions" – local investments required of foreign contractors by many arms-procuring countries as a ticket of admission for doing business locally. The issue in this case is whether ASASCO can compel a former client (Textron) to pay a commission promised

---

[1] The contracting documents suggest that ASASCO's presence in Riyadh consisted mainly of a post office box.

by a nonparty (Blenheim) that had agreed to provide Textron with offset services.[2]

ASASCO alleges that for nearly a decade it assisted Textron in the marketing and sale of sensor fuzed weapons ("cluster bombs") to Saudi Arabia.[3] The relationship between Textron and ASASCO was governed by a Consulting Agreement entered in March of 2005. The Agreement, which was subsequently modified and renewed in certain nonmaterial respects, expired

---

[2] While not an issue raised by the parties, contractual arrangements involving offset payments, particularly those involving layers of contractors, are controversial and potentially subject to scrutiny under the U.S. Foreign Corrupt Practices Act, 15 U.S.C. § 78dd-1. As a respected non-governmental organization has warned: "Offsets transactions carry potentially high risks of corruption, not only due to the high level of secrecy within defence procurement as a whole, but because they usually lack the scrutiny and monitoring of the corresponding acquisition contract. . . . Besides the risk of bribery in offsets contracts, there is an additional risk that main supplier companies may be using the offsets package as a vehicle to offer benefits to individuals in return for undue influence or access to defence contracts. In short, offsets may influence the acquisition decision rather than the quality of the good or service offered." Louise Fluker, Julia Muravska, and Mark Pyman, Transparency International UK, *Due Diligence and Corruption Risk In Defence Industry Offset Programmes* 10, Tiffany Clarke, ed. (London, UK: February 2012).

[3] The United States and the Kingdom of Saudi Arabia are not signatories to the Convention on Cluster Munitions banning the use, transfer, and stockpile of cluster bombs. The Convention, sponsored by the United Nations, entered into force on August 1, 2010. http://www.stopclustermunitions.org/en-gb/the-treaty/treaty-status.aspx (last visited March 7, 2016).

in 2013. Under the terms of the Agreement, Textron was to pay ASASCO a fixed consulting fee (which was reduced substantially over the life of the contract). Each iteration of the Agreement included a clause limiting ASASCO's remuneration to the consulting fee alone.[4] In 2011, an integration clause was inserted into the Agreement stating that "[T]his Agreement constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements or understandings, written or oral. Each party hereby waives the right to assert any claim against the other . . . based on any oral representations, statement, promise or agreement." Dkt. #71-3 at 107.

ASASCO alleges that notwithstanding the written Agreement, Textron promised repeatedly that it would pay it a percentage of any successful sale in addition to the consulting fee.[5] Specifically, ASASCO alleges that Textron

---

[4] Each edition of the Agreement provided that "no additional payments" (travel reimbursement excluded) were to be paid to ASASCO, and that ASASCO "shall not receive any compensation or commission based . . . on the volume of sales." Dkt. # 71-1 at 131, Dkt. # 71-3 at 30, Dkt. # 71-3 at 100. In 2011, the parties added language specifying that the consulting fee was "full and adequate compensation . . . and [the] exclusive remuneration to be paid" ASASCO by Textron. Dkt. 71-3 at 99.

[5] ASASCO cites both oral and written communications from Textron, including proposed draft agreements for offset services drawn up by Textron, in support. See Dkt. # 71-1, Exs. 12-14, 22. Of these, ASASCO chiefly relies on an internal Textron email from 2008, forwarded to ASASCO, which states

intended to use money generated through the offset obligations to funnel commission payments to ASASCO. In 2006, Textron engaged Blenheim to craft an "offset solution" for a sale of cluster munitions to Saudi Arabia. ASASCO alleges that it collaborated with Textron and Blenheim over the next two years in drafting two contracts, one between Textron and Blenheim (the Offset Services Agreement (OSA) finalized in February of 2008), and a separate subcontracting agreement between ASASCO and Blenheim (finalized in April of 2009).

Under the OSA, Textron promised Blenheim a percentage of the sale of munitions in exchange for its servicing of the offset obligations. The OSA prohibited Blenheim from hiring any subcontractor other than ASASCO without Textron's written consent. ASASCO was not a party to the OSA.

Under Blenheim's subcontractor agreement with ASASCO, to which Textron was not a party, Blenheim agreed to pay ASASCO 75% of any fee paid by Textron into "the Escrow Account." Dkt. # 23-2 at 11. The Agreement stated that the Escrow Account would be created "as soon as practicable," and that the OSA between Blenheim and Textron would be modified to

---

that Textron had an offset agreement in place with ASASCO "through Blenheim." Dkt. # 71-1, Ex. 22.

4

channel all payments from Textron directly into the Escrow Account.[6] *Id.* at 12. The Blenheim-ASASCO Agreement also stated that the contract would expire automatically if the OSA were to be terminated "for any reason." *Id.* at 4. Finally, the Agreement contained an integration clause stating that the writing "embodies and sets forth the entire agreement and understanding of the parties and supersedes all prior oral or written agreements, understandings or arrangements relating to the subject matter of this Agreement." *Id.* at 16.[7] In 2008, before the Blenheim-ASASCO Contract was finalized, Textron ceased paying ASASCO's monthly consulting fee without any objection forthcoming from ASASCO.

On January 18, 2011, Textron and Blenheim entered into an Offset Services Framework Agreement intended to replace the OSA. In January of 2012, Textron and Blenheim formally terminated the OSA, thus triggering

---

[6] The OSA was in fact never so modified, and no escrow account was ever created.

[7] The Agreement provides very few clues as to the nature of the services ASASCO was to provide to Blenheim. It simply defines the "Sub-contracted Services" as "all services agreed to be performed by Blenheim for [Textron] pursuant to the [OSA] including, without limitation, the obligations of Blenheim under Article 2 thereof." Dkt. # 71-3 at 5. Article 2 of the OSA declares that Blenheim would either obtain approval from the Saudi Kingdom for "offset projects" (which Textron and Blenheim were to designate in a separate writing) and subsequently implement any such projects, or would persuade the Saudi government to waive Textron's offset obligation.

5

the termination of the subcontracting agreement between Blenheim and ASASCO. Blenheim subsequently ceased communicating with ASASCO, although ASASCO claims it remained unaware that its contract with Blenheim had been terminated.

ASASCO alleges that it had continuing discussions with Textron regarding potential offsets arrangements through 2011, and continued to lobby Saudi Arabia on Textron's behalf.  In December of 2011, Textron and Saudi Arabia agreed to the terms of the cluster bomb sale.  Textron promptly notified ASASCO of the agreement.  The sale was finalized in August of 2013. On August 29, 2013, Textron notified ASASCO that the Consulting Agreement, which was due to expire in two days, would not be renewed.

On July 15, 2015, ASASCO brought this lawsuit against Textron claiming breach of contract (Count I), tortious interference with contractual relations (Count II), and violations of the Massachusetts Unfair Business Practices statute, Gen. Laws ch. 93A (Count III).  ASASCO alleges that Textron "paid Blenheim directly in breach of the Offset Services Agreement's requirement that any such payments be made to an escrow account." Compl. ¶ 42. ASASCO also alleges that Textron breached the OSA by terminating it without the consent of ASASCO as a third-party beneficiary.  Finally,

ASASCO claims that Textron, by improperly terminating the OSA, induced Blenheim to breach its separate contract with ASASCO.

Textron responded with a motion to dismiss for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). Textron further maintained that ASASCO's claim for tortious interference with contractual relations was barred by the statute of limitations. On October 1, 2015, this court notified the parties of its intent to convert the motion to dismiss pursuant to Fed. R. Civ. P. 12(d) into a motion for summary judgment under Fed. R. Civ. P. 56. The court authorized limited discovery pertaining to ASASCO's knowledge of the termination of the OSA, the authenticity of the Consulting Agreement, and the preclusive effect, if any, of its terms, particularly the integration clauses.

## DISCUSSION

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment shall not be granted if the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party

bears the initial burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

ASASCO's claim for breach of contract is based on the allegation that it was a third-party beneficiary of the OSA between Textron and Blenheim and that Textron and Blenheim terminated the OSA without notice to it and without its permission. "[W]hen one person, for a valuable consideration, engages with another, by simple contract, to do some act for the benefit of a third, the latter, who would enjoy the benefit of the act, may maintain an action for the breach of such engagement." *Rae v. Air-Speed, Inc.*, 386 Mass. 187, 195 (1982) (quoting *Brewer v. Dyer*, 7 Cush. 337, 340 (1851)). It is also true that one need not be the intended beneficiary of every provision of a contract to have a discrete enforceable contractual right as a third party. *The James Family Charitable Found. v. State Street Bank and Trust Co.*, 80 Mass. App. Ct. 720, 725 (2011). However, the third party may maintain an action only "for the breach of such engagement," that is, for the failure of one of the signatories to perform the contractually promised act. *Rae,* 386 Mass at 195.

With respect to the OSA entered by Textron with Blenheim, ASASCO was the intended beneficiary in only one respect. Blenheim was prohibited from hiring any subcontractor other than ASASCO to work on the cluster

8

bomb sale to Saudi Arabia. There is no dispute of fact but that Blenheim did hire ASASCO and that no other subcontractor was hired during the life of the OSA. In other words, Blenheim did for ASASCO all that it was obligated to do under the terms of its contract with Textron.[8]

ASASCO's alternative argument – that Textron breached the "Offset Services Agreement's requirement that any such payments be made to an escrow account," Compl. ¶ 42 – similarly has no merit. Nothing in the OSA required Textron to either create an escrow account or to deposit funds into it. The escrow account figured only in the subcontracting agreement between Blenheim and ASASCO, to which Textron was not a party. Moreover, no facts are alleged under which Blenheim could be deemed the actual or apparent agent of Textron with regard to any binding promise of a kickback to ASASCO.[9]

---

[8] Any oral representations to ASASCO by Blenheim expanding on its contractual obligations under the OSA are barred by the integration clause, and in any event would not be binding on Textron.

[9] The termination of the OSA triggered the automatic termination of ASASCO's contract with Blenheim. This provision, however, was negotiated by Blenheim and ASASCO without Textron's participation. To the extent that Textron had an obligation to notify ASASCO of a successful sale, it is undisputed that it did so in December of 2011 immediately after the munitions agreement with Saudi Arabia was reached. While Blenheim may have promised to give actual notice to ASASCO of the termination of the OSA, that evidence would be excluded by the agreement's integration clause, and moreover, would be of no concern to Textron as a nonparty. Finally,

ORDER

For the foregoing reasons, Textron's motion for summary judgment is ALLOWED.  The Clerk will enter judgment for Textron and close the case.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE

---

because Textron did all that it was contractually obligated to do, there is no viable allegation of tortious interference or violations of Chapter 93A.  In sum, ASASCO has picked a quarrel with Textron, when its real nemesis is Blenheim.