**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| _____ ) | | |
| ARABIAN SUPPORT & SERVICES ) | | |
| COMPANY, LTD., ) | | |
| ) | | |
| Plaintiff, ) | | Civil Action |
| ) | | No. 15-12951-PBS |
| v. ) | | |
| ) | | |
| TEXTRON SYSTEMS CORPORATION, ) | | |
| ) | | |
| Defendant. ) | | |
| _____) | | |

**MEMORANDUM AND ORDER**

March 19, 2019

Saris, C.J.

**INTRODUCTION**

This is a dispute arising out of the sale of cluster bombs – also known as sensor fuzed weapons ("SFWs") – to the Saudi Arabian government. Plaintiff Arabian Support & Services Co. ("ASASCO"), a Saudi Arabian company, brings this action against Defendant Textron Systems Corporation ("Textron" or "TSC"), a Massachusetts-based defense contractor, alleging that it is entitled to six percent of the value of TSC's sale of bombs to Saudi Arabia as compensation for its efforts to help TSC secure the contract. ASASCO seeks compensation from TSC based either on the promise of additional compensation for securing the sale of

1

the cluster bombs or on the promised opportunity to provide offset services related to the sale. In the First Amended Complaint (Docket No. 107) ("Compl."), ASASCO asserts claims of fraudulent inducement (Count I), intentional misrepresentation (Count II), negligent misrepresentation (Count III), quasi contract/implied contract/promissory estoppel (Count IV), quasi contract/unjust enrichment/quantum meruit (Count V), and violation of the Massachusetts Consumer Protection Act, M.G.L. c. 93A ("Chapter 93A") (Count VI). The parties have engaged in extensive discovery.

Before the Court is TSC's motion for summary judgment on all counts (Docket No. 190) and three motions to strike certain witness statements and opinions (Docket Nos. 194, 196, and 221). TSC also renews its motion for judgment on the pleadings (Docket No. 193).[1] After hearing, the Court **ALLOWS** TSC's motion for summary judgment on all counts. The Court **DENIES AS MOOT** all three motions to strike because resolution of the motion for summary judgment does not depend on any of the disputed testimony or expert opinions. The Court also **DENIES** TSC's renewed motion for judgment on the pleadings on the ground the Court has ruled on the motion for summary judgment.

---

[1] The Court previously denied the motion without prejudice (Docket No. 135).

<u>BACKGROUND</u>

Unless otherwise noted, the following facts are undisputed.

## I. <u>The Beginning of the TSC-ASASCO Relationship</u>

In order to sell munitions and other defense items to the government of Saudi Arabia, TSC needed a consultant in Saudi Arabia who could provide it with access to Saudi government officials and convince those officials to budget funding towards TSC-specific products. The relationship between TSC and ASASCO largely developed through interactions between Avedis (Avo) Boyamian, TSC's Director of Middle East Business Development, and Mansour Al-Tassan, ASASCO's President and founder. At the recommendation of General Abdullah Hamdan, considered the "father" of the modern Saudi Arabian air force, Boyamian and Al-Tassan began to discuss working together in 2001. By 2003, the men were discussing the market potential of selling cluster bombs to the Royal Saudi Air Force. In the spring of 2004, TSC began to discuss internally how best to structure a business relationship with ASASCO.

One key hurdle to the relationship was ensuring that any agreement and compensation scheme was lawful under U.S. and Saudi law. To that end, Robert Kemp, TSC's General Counsel, sought legal advice from the International Law Firm in Riyadh on how to structure the relationship. On March 24, 2004, he emailed attorney Yusuf Giansiracusa, asking about the permissibility of

engaging a marketing consultant on a fixed monthly fee basis and the feasibility of ASASCO's serving as a service center provider in Saudi Arabia. Giansiracusa advised that "[e]mploying a marketing consultant for one or many different projects and/or products is, in general, permissible as a matter of Saudi law." Pl. Ex. 27.[2] But he cautioned that if a consultant's "fixed fee is merely a commission re-styled as a fixed fee, it will not be permissible if the commission would not be permissible." Id. Giansiracusa approved of the idea of using ASASCO as a service center provider and suggested that there is "no reason in principle that Asasco [sic] couldn't act as a marketing consultant as well as a Service Centre operator under separate contracts." Id. Finally, he noted that "[a]s a lethal product, the SFW cannot be sold through an agent." Id.

On April 30, 2004, Boyamian forwarded a letter to ASASCO, which stated: "The Textron Systems' management team would appreciate your advocacy support for the [Royal Saudi Air Force] procurement of SFW. In recognition of your advocacy, TSC is prepared to appoint ASASCO as a service center for support to the [Royal Saudi Air Force] SFW program." Pl. Ex. 32.

---

[2] Record citations are the exhibit numbers designated by the parties as described in the tables of contents (Docket Nos. 228, 229, 230, and 231).

Kemp emailed Giansiracusa again on July 8, 2004 requesting

advice on the possibility of paying ASASCO via a commission for

securing the sale of the bombs. Kemp wrote:

> [W]e do not have a business case for a joint venture
> with ASASCO because of the nature of this
> weapon . . . . In addition, because of the potentially
> great expense of engaging a consultant on a fixed,
> periodic, non-contingent fee basis, we have been asked
> to determine whether it would be possible to engage an
> advocate of the type described above on a commission
> basis, i.e. with the amount of the payment based on
> the size of the ultimate order received and contingent
> upon the receipt of an order.
>
> Avo [Boyamian] has identified ASASCO as the likely
> advocate for Textron Systems, and he anticipates that
> they will expect a fee in the range of four percent
> (4%) of a sale.

Pl. Ex. 37. On September 1, 2004, Vernon Cassin of the

International Law Firm advised Kemp that the sale of munitions

in Saudi Arabia is governed by the Council of Ministers

Resolution No. 1275 ("Resolution 1275"). Resolution 1275 states,

in relevant part:

> No firm holding a contract with the Saudi Government
> for the supply of arms or equipment required by the
> Saudi Government may pay any sum as a commission to
> any intermediary, sales agent, representative or
> broker. This prohibition shall apply regardless of the
> nationality of the firm or the nationality of the
> intermediary, sales agent, representative or broker.
> It shall apply also whether the contract was concluded
> directly between the Saudi Government and the firm or
> through a third-party State.

Pl. Ex. 39. Cassin advised Kemp that the proposed TSC-ASASCO relationship had "a significant risk of falling within the scope of the relationships prohibited under Resolution 1275." [3] Id.

On September 15, 2004, Boyamian emailed Al-Tassan, asking to meet in person to discuss the legal opinion provided by Cassin. When Boyamian and Al-Tassan met in Cairo a week later, Boyamian confirmed that TSC was prepared to pay ASASCO an amount equal up to five percent of the total value of the SFW contract, but that the agreement had to comply with U.S. and Saudi law. Boyamian told Al-Tassan that based on Resolution 1275, offsets were the "only way" ASASCO could receive such payments.[4]

---

[3] The basis for Cassin's opinion was as follows:

> [W]e believe that the key factors that would cause a relationship to be likely to fall within the categories covered by Resolution 1275 are (i) whether the compensation is being paid for the purpose of marketing or intermediation, (ii) whether the compensation is contingent upon the conclusion of a successful sale and (iii) the compensation is substantial either in the absolute or as a percentage of the sale.
>
> In the case you have described, the proposed compensation certainly appears to fall within categories (ii) and (iii) described above and arguably falls within category (i) as well. Although it is difficult to make a determination with any certainty because of the lack of cases in which Resolution 1275 was, judged to be applicable, based on our reading of the regulation and our discussions with people active in the field, we believe that the arrangement you have described has a significant risk of falling within the scope of the relationships prohibited under Resolution 1275.

Pl. Ex. 39.

[4] As background, an offset requirement allows a foreign government to use its leverage as a purchaser to require a defense contractor to invest in the foreign country as a condition of the arms sale. Usually, the purchasing country establishes policies that require a foreign defense contractor to invest some portion of the contract price back into the purchasing country to create jobs or develop industries. A defense supplier is usually permitted to build the price of offsets into the purchase price of the munitions, which has the effect of the foreign government purchaser ultimately paying for part

Pl. Ex. 3 at 330:5-9. In 2004, both TSC <u>and</u> Al-Tassan believed that ASASCO could not receive a commission on the sale of SFWs under Saudi Arabian law.

## II. **The Consulting Agreements (2005-2009)**

TSC and ASASCO executed four consulting agreements between 2005 and 2009. On November 10, 2004, Boyamian formally nominated ASASCO to be TSC's consultant in Saudi Arabia, with a focus on selling SFWs to the Royal Saudi Air Force. Boyamian explained in his nominating email to TSC leadership that "[t]he use of commissioned representatives for sale of weapons in Saudi Arabia is not authorized under local Royal Decree. General consulting agreements to support foreign companies are acceptable." Pl. Ex. 44. In late February 2005, TSC and ASASCO executed the first consulting agreement. Al-Tassan understood at that time that ASASCO's role as a consultant was "to advocate the SFW sale." Def. Ex. 1 at 45:14-17. ASASCO entered into this first consulting agreement (and all other consulting agreements) because of promises from TSC that ASASCO would receive additional compensation via the offset requirements for its efforts to assist TSC in selling SFWs.

---

of the investment. Offsets are categorized as "direct" or "indirect." Direct offsets occur where the offset project is directly related to the defense item being sold. For example, establishing a local company which could build, service, and maintain aircrafts sold to the purchasing country. However, some defense items do not lend themselves well to direct offsets. Instead, the defense contractor may provide indirect offsets by investing in non-defense related industries.

Al-Tassan negotiated, read, and understood the terms of the agreement before signing on behalf of ASASCO. The first agreement was for a year-long term during which ASASCO would be compensated $10,000/month. Section 4(b) of the 2005 consulting agreement stated:

> It is expressly agreed by the parties hereto that any and all services rendered by [ASASCO] to [TSC] shall be deemed to have been given pursuant to this Agreement and no additional payments (with the exception of reimbursement for international travel approved in advance by [TSC]) shall be due to or paid to [ASASCO].

Def. Ex. 4 § 4(b). Importantly, in § 4(c) of the agreement, the parties expressly agreed that ASASCO "shall not receive any compensation or commission based in any manner whatsoever on the volume of sales of the [TSC] products and/or services procured or received under this Agreement." Id. § 4(c). The agreement also contained a statement of work which remained, in all relevant respects, the same throughout the parties' business relationship. The statement of work included several tasks ASASCO was expected to complete as a consultant, including "[a]dvocat[ing] at the Saudi [Ministry of Defense and Aviation] or at any other concerned Saudi Authority which is involved in approval of funds, to secure allocation of funds for [TSC's] potential programs." Def. Ex. 4 sched. A.

TSC and ASASCO periodically renewed and extended the consulting agreements. On January 1, 2006 and January 1, 2007,

TSC and ASASCO executed the second and third consulting agreements, respectively. Each of these agreements contained substantially similar terms as the first consulting agreement.

After three years of paying ASASCO $10,000 per month, TSC considered terminating the consulting relationship with ASASCO. On July 1, 2008, Tom Saling from TSC sent Al-Tassan a letter explaining that TSC would only extend the 2007 consulting agreement on its original terms of $10,000/month through August 31, 2008. Saling explained to TSC officials in July 2008 that, "[TSC] will be terminating the consulting services of ASASCO of Saudi Arabia effective August 31, 2008. The ASASCO agreement was specifically structured to support the sale of SFW to the Kingdom. The sale of SFW to the Kingdom of Saudi Arabia is pending US Government export approval." Pl. Ex. 81. Boyamian followed-up with Al-Tassan on August 15, 2008, writing in part, "[t]his is in ref to our recent telecom regarding the expiration of the Textron Systems–ASASCO consulting contract on August 31st, 2008 and I regret to confirm that TSC will not be able to renew the Contract beyond August 31st, 2008." Pl. Ex. 82.

In early September 2008, Boyamian convinced TSC to renew its consulting agreement with ASASCO under a no-fee arrangement. Boyamian told Kemp that "ASASCO [did] not expect to be compensated, even in 2009." Pl. Ex. 83. However, Kemp noted in an email to Saling and Boyamian that "this is such a peculiar

arrangement that . . . it would make more sense to provide a small month [sic] fee in consideration for [ASASCO's] continuing availability to consult with [Boyamian]." <u>Id.</u>

On September 4, 2008, TSC and ASASCO executed an extension of the 2007 consulting agreement on a "no-fee basis." The extension letter to Al-Tassan stated in part that "[a]s you have previously discussed with Avo Boyamian, effective September 1, 2008, ASASCO will not receive the monthly consultancy fee for the extended term of the agreement." Def. Ex. 9. A few days later, Boyamian sent an email to colleagues at TSC explaining the no-fee arrangement: "Effective September 1st, 2008, TSC stopped paying ASASCO the monthly consultancy fee because, TSC through Blenheim, an offset service provider company based in UK, has an offset service providing agreement with ASASCO for TSC business offset requirements in Saudi Arabia." Pl. Ex. 93. Boyamian forwarded this email to Al-Tassan the next day. At the time, TSC, ASASCO, and Blenheim Capital Partners, Ltd. ("Blenheim") were still negotiating the terms of pending offset services agreements, discussed further below. The "no-fee" consulting agreement was extended through August 31, 2009, when TSC and ASASCO entered into a fourth consulting agreement. The fourth agreement was effective September 1, 2009 through August 31, 2011, and paid ASASCO a consulting fee of $500 per month as Kemp suggested.

III. **The Separate Offset Agreements**

A. **Offsets in Saudi Arabia**

According to ASASCO's expert Leslie Janka,[5] Saudi Arabia generally requires offsets on foreign sales to the Saudi Ministry of Defense and Aviation. A defense contractor's offset requirement is set by establishing a percentage of the total value of the sale that must be earned in "offset credits." For the relevant time period, the Saudi government required offsets of 35% of the total purchase price – until 2012 when it increased to 40% of the purchase price – for all defense contracts in excess of 400 million Saudi riyals (approximately US $104 million). Saudi regulations appear to require a defense contractor to have an approved offset plan in place before a supply contract can be signed. However, a defense contractor is not obligated to perform the offsets itself but can subcontract the obligation to a third-party offset services provider. The provider is obligated to develop and get approval for offset projects to earn the defense contractor the required offset credits. For reasons of expediency or politics, Saudi Arabia may

---

[5] TSC moves to strike and exclude certain opinions of ASASCO's expert, Leslie Janka (Docket No. 196). The Court did not consider Janka's opinions in ruling on the motion for summary judgment, rather only relied on Janka's report to understand how offsets generally work. The motion to strike is therefore denied as moot.

waive an offset requirement. The waiver would usually occur through a written document.

**B. TSC-ASASCO Offset Conversations (2006)**

While executing the first consulting agreement, Boyamian and Al-Tassan continued to discuss additional compensation for ASASCO via offsets. Boyamian explained that by May 2006, TSC and ASASCO "had a consultancy agreement, which is a standing alone agreement. Now, we were starting – [Al-Tassan] was talking about joint venture activities or offset-providing activities. That was a totally separate subject." Pl. Ex. 2 at 138:16-139:1.

In May, Al-Tassan emailed Boyamian a proposed structure for the offset arrangement and invited TSC to respond and comment. The proposal detailed how TSC would pay $35 million to Aerosource Inc., a company fully owned and operated by ASASCO. Aerosource would invest $5 million in economic offset projects in Saudi Arabia and retain the remaining $30 million as a "consultancy fee." One of Al-Tassan's stated objectives of the proposal was "[t]o facilitate consultancy fees to ASASCO." Pl. Ex. 50.

TSC responded to Al-Tassan's proposal shortly afterwards. TSC mentioned investing five percent of the value of the SFW contract into offset projects, but it noted that "[a]ll such activity must result in Saudi Gov't approval of offset projects, grant credits/or waive requirement." Pl. Ex. 51. "Next steps"

would be for TSC and ASASCO "to review potential project portfolio and develop strategy to gain Saudi approval as offset," and for TSC "to provide ASASCO with 'offset provider' agreement as means to begin to solidify approach." Id.

In June 2006, Boyamian emailed Al-Tassan a draft offset provider agreement between ASASCO and TSC. The agreement was prepared by Neil Rutter, TSC's Offset Manager. The draft provided that ASASCO would be "entitled to receive a fee of X percent (X%) of the value of an Offset Waiver provided that TSC is satisfied that any potential Offset Obligation has been waived irrevocably." [6] Pl. Ex. 53 § 2.1. Alternatively, ASASCO would be "entitled to receive a fee of X percent (X%) of the value of an Offset Credit obtained through successful execution of an Offset Project." [7] Pl. Ex. 53 § 3.1. For ASASCO to be compensated for any offset credits, the draft provided that TSC had to advise ASASCO in writing that it had approved the offset project. Pl. Ex. 53, § 3.2. This draft agreement was never finalized or signed by the parties.

---

[6] The draft agreement defined "Offset Waiver" as "a value, stated in dollars, by which TSC's actual Offset Obligation with respect to the Supply Contract is less than thirty-five percent (35%) of the value of the Supply Contract or the Offset Obligation[], whichever is higher." Pl. Ex. 53 § 1.5.

[7] The draft agreement defined "Offset Credits" as "the value of a credit, stated in dollars, that would reduce TSC's Offset Obligation[] in accordance with the Offset Agreement and which are obtained through an Offset Project." Pl. Ex. 53 § 1.2.

On June 26, 2006, Boyamian forwarded Al-Tassan an email chain containing a series of internal TSC emails discussing ASASCO as a consultant and an offset services provider. The email chain contained instructions for a compliance analyst at TSC to prepare "two books: one for a new offset agreement with ASASCO, and one for a renewal of the consultant agreement." Pl. Ex. 54. Boyamian forwarded the emails to Al-Tassan to motivate him. Boyamian understood the consulting agreements and the proposed offset agreement as "two separate things." Pl. Ex. 2 at 155:23-156:1. Al-Tassan also understood that any arrangement under which payment would be made for offset related services would be a separate fee from the fee paid to ASASCO under the consulting agreements.

### C. Blenheim Capital (2006-2007)

On September 12, 2006, Rutter advised TSC leadership that because of certain legal limitations on foreign military sales, TSC needed to engage a third party, Blenheim Capital, to manage the investing and coordination of offset services in Saudi Arabia. ASASCO would continue to develop offset projects, but Rutter noted that ASASCO did "not ha[ve] much experience with offset [sic] in the Kingdom (or anywhere else)." Pl. Ex. 56. Rutter suggested that TSC needed to "[c]ome to an agreement with Blenheim Capital to support [TSC's] offset activities in the Kingdom, at a cost not to exceed 2%, with payments again being

contingent on a sale." Id. Later in September, Boyamian emailed Al-Tassan to request that Al-Tassan meet with a representative from Blenheim to further discuss offset projects. By June 2007, TSC had decided to create a TSC-Blenheim agreement and then a separate Blenheim-ASASCO agreement instead of directly contracting with ASASCO for offset services.

### D. TSC-Blenheim Offset Agreement (2008)

In February 2008, TSC entered into an Offset Services Agreement ("OSA") with Blenheim. The agreement established a relationship between the companies in which Blenheim would help TSC either avoid any offset requirements or meet any formal offset obligations that arose from the sale of SFWs. The OSA provided that, in the event that Blenheim was able to acquire a waiver, TSC agreed to pay Blenheim a fee of two percent or six percent of the value of the SFW supply contract, depending on whether the sale was completed as a government-to-government sale or as a direct commercial sale, respectively. The OSA provided that if there was a waiver of the offset obligation, it must be completed within six months of the sale. In the event that TSC entered into an offset contract with Saudi Arabia, the OSA provided Blenheim would receive a fee of six percent of the value of the supply contract for any offset credits actually received. Blenheim could enter into a subcontract with ASASCO to fulfill its duties under the OSA but could not enter into a

subcontract with any other third party without the written
consent of TSC.

### E. ASASCO-Blenheim Agreement (2009)

During the summer and fall of 2007, before the OSA between
TSC and Blenheim was finalized, Al-Tassan continued to negotiate
ASASCO's compensation under an offset agreement. Boyamian sent
Al-Tassan a draft of the OSA between TSC and Blenheim on June
14, 2007. The OSA draft included a fee to Blenheim of six
percent. On June 21, 2007, Al-Tassan met with Boyamian, Rutter,
and Grant Rogan (from Blenheim) at the Paris Air Show to further
discuss offsets. At that meeting, Al-Tassan alleges that
Boyamian promised him ASASCO would receive six percent of the
value of the supply contract for offset services, and Blenheim's
fee would be two percent.

Throughout the fall of 2008 and spring of 2009, Al-Tassan
continued to negotiate ASASCO's exact fee with TSC and Blenheim.
On September 8, 2008, Al-Tassan emailed Boyamian with edits to
the proposed Blenheim-ASASCO agreement. He stated: "What is
unacceptable is the fee structure. . . . To receive '75% of such
fee paid by "TSC" to the Escrow Agreement' is not as we have
agreed in Abu Dhabi and Paris." Pl. Ex. 91. Al-Tassan emailed
Boyamian again on November 11, 2008 to get his input on the
payment structure between the three companies. Boyamian replied
that Al-Tassan should look back at the TSC-Blenheim agreement,

but that it was his understanding that "Textron will be paying 8% of the contract value" to an escrow account with Blenheim to meet its offset obligations, of which ASASCO would be entitled to seven-eighths. Pl. Ex. 98. This understanding turned out to be incorrect. The final OSA signed between TSC and Blenheim, as stated above, provided that Blenheim would receive six percent of the value of the supply contract, contingent on providing credits or a waiver.

In early 2009, Al-Tassan emailed representatives from TSC and Blenheim twice asking for clarification about ASASCO's fee – essentially asking for confirmation that 75% of what Blenheim received from TSC equated to six percent of the value of the supply contract. Al-Tassan also indicated at that time he thought there were "two parts of the fee" – a fee for acquisition and a fee for offsets. Pl. Ex. 100. There is no record that anyone from TSC or Blenheim responded to either of these emails.

Nevertheless, on April 6, 2009 Blenheim and ASASCO finalized and entered into a subcontract whereby ASASCO would assist Blenheim in its efforts to secure either an offset waiver or an offset contract with Saudi Arabia (hereinafter the "ASASCO-Blenheim Agreement"). Al-Tassan believed that the ASASCO-Blenheim Agreement would be "a vehicle to pay ASASCO" a "success fee." Def. Ex. 1 at 124:15-23.

The agreement provided, in part, that if TSC paid a fee into the escrow account pursuant to the OSA (between TSC and Blenheim), then ASASCO would be entitled to 75% of such fee. Additionally, if TSC entered into a formal offset obligation with Saudi Arabia, then ASASCO's fees would have to be used solely for the purpose of investment in offset credit projects approved by Saudi Arabia. Al-Tassan understood that ASASCO could only be paid under the ASASCO-Blenheim Agreement if there was a waiver of offset obligations or if offset credits were earned by an offset program approved by Saudi Arabia. The agreement defined its "Termination Date" as "the date on which the Offset Services Agreement [OSA] is terminated for any reason." Pl. Ex. 104 ("ASASCO-Blenheim Agreement") § 1.1.

**IV. 2011-2013**

**A. Al-Tassan Leaves Saudi Arabia**

In early 2011, Al-Tassan left Saudia Arabia for Bahrain and has, to date, never returned. Al-Tassan's decision to leave Saudi Arabia stemmed from a civil judgment entered against him in the General Court in Riyadh for the equivalent of $26.5 million. The judgment arose from a civil dispute involving the Bahraini Executive Air Services Company ("Bexair"), in which Al-Tassan owns shares and for which he serves as chairman. The judgment was entered against Al-Tassan on October 12, 2009. On June 22, 2010 the Riyadh police issued a civil arrest warrant

for Al-Tassan pursuant to its debt collection procedures. In connection with the civil arrest warrant, an electronic order ("travel ban") prohibiting Al-Tassan from leaving Saudi Arabia was issued. Al-Tassan never informed TSC or Blenheim of the judgment, arrest warrant, travel ban, or his decision to leave Saudi Arabia. Additionally, Al-Tassan specifically hid the fact that he was not in Saudi Arabia from TSC officials. On at least one occasion after he fled Saudi Arabia, Al-Tassan asked his assistant, Dennis Shotwell, to draft an email with an excuse for not being able to meet TSC officials in Riyadh, which he ultimately sent to TSC officials.

When Al-Tassan left Saudi Arabia in early 2011, ASASCO was still a party to the consulting agreement and the ASASCO-Blenheim Agreement. ASASCO still arranged for meetings between TSC and Saudi government representatives, but ASASCO representatives did not attend a single in-person meeting with Saudi officials regarding TSC's business after Al-Tassan left the country.

**B. TSC Re-Evaluates the OSA**

On May 5, 2011, Stephen Fogarty, TSC's newly hired Director of Business Offsets, sent an email to officials at TSC saying it was "imperative" that the Blenheim OSA for Saudi SFWs be terminated for a variety of reasons. Pl. Ex. 121. Attached to the email was Fogarty's evaluation of the financial impact of

the OSA. As part of Fogarty's evaluation, he noted that a "6% fee based on full contract value is excessive" in either the waiver or offset credit scenario. Id. He further noted that "[b]ased on 35% Offset Obligation, the fee as a percentage of Offset Obligation is 17.1%," and that this was "beyond any measure of reasonableness." Id. Besides terminating the OSA, Fogarty also recommended that TSC "[d]evelop alternative offset projects in advance" of Saudi Arabia signing a formal agreement with the United States to purchase SFWs. Id.

The next day, a TSC official forwarded Fogarty's evaluation to TSC leadership and recommended that TSC terminate the OSA. The official noted that the OSA included a sub-agreement whereby ASASCO would receive "2/3 of the fee" which he described as "[v]ery out of the ordinary." Pl. Ex. 122. He explained that TSC used ASASCO "as a consultant on SFW and therefore we would be taking food off the table of our own consultant." Id.

**C. United States Announces Foreign Military Sale**

Meanwhile, the sale of SFWs was rapidly moving forward. In January 2011, Saudi Arabia sent a letter to the United States government officially requesting that it be allowed to buy 1,300 SFWs from the United States. On June 10, 2011, the Department of Defense provided statutorily required notice to Congress of a possible sale to Saudi Arabia of SFWs, associated equipment, parts, training, and logistical support for an estimated cost of

$355 million. The notice stated that "[t]he prime contractor
will be Textron Systems Corporation of Wilmington, MA. There are
no known offset agreements proposed in connection with this
potential sale." Pl. Ex. 126.

**D. TSC Discusses Offsets with Saudi Arabia**

Before Saudi Arabia signed a final contract with the United
States, TSC, as the SFW supplier, sought to finalize an offset
arrangement with Saudi Arabia. On July 19, 2011, Tom Boyle from
TSC sent an offset concept paper to Brigadier General Mohammad
Al-Lomalen, the Assistant to the Secretary of the Saudi Economic
Offset Committee, detailing a proposed offset project with
Bexair-Saudi Arabia. Tom Boyle's email to General Al-Lomalen
stated, in part:

> After our meeting in Paris a few weeks ago and our
> discussions regarding the next steps to finalize the
> Textron Saudi Offset Contract, we have taken the steps
> to develop a Saudi Company that will work with us and
> the [Royal Saudi Air Force ("RSAF")] on our Sensor
> Fused Weapon (SFW) contract and we will utilize as a
> direct offset project . . . .
>
> The attached concept paper details that we will work
> with Bexair-Saudi Arabia (www.bexair.com) in Riyadh to
> do the RSAF pilot training on the SFW program as part
> of our offset program. We are in the process of
> finalizing an MOA with Bexair-Saudi Arabia and will
> complete it soon to include it in out [sic] offset
> contract with the [Economic Offset Secretariat
> ("EOS")].
>
> If the concept paper meets with EOS approval, we will
> complete the MOA documentation and set up an
> appointment with you to meet at your offices and sign
> the offset contract documents.

Def. Ex. 29. One day later, General Al-Lomalen responded:

> EOS has analyzed your proposal, and has the following comments:
>
> 1. The proposal does not meet the priorities set by the [Economic Offset Committee]. At this point of time manufacturing and life cycle support are the fields [EOC is prioritizing].
>
> 2. To avoid any embarrassment, we strongly recommend that you consult with the EOC before engaging any third party. EOC will evaluate and approve the beneficiary company based on different factors like the in-kingdom capabilities, reputation, past experience, financial status and Saudi manpower.
>
> . . .
>
> 4. You should be aware that we are in close coordination with the RSAF. . . . And unless we conclude an Offset Agreement very soon, your endeavors with them may be affected. In addition you will be vulnerable to the new [offset] guidelines.
>
> Therefore we suggest that you take the matter more seriously and develop a different proposal(s) that addresses the priorities referred to above. We also recommend that you, promptly, deploy a team with enough authority and experience, to come to the kingdom to work with us face to face.

Id. Boyamian relayed to Al-Tassan that the Economic Offset Committee "did not appreciate our proposal for a training program. [It] is asking us to come up with a project to involve manufacturing." Pl. Ex. 128.

During the fall of 2011, TSC and Al-Tassan continued to exchange emails and have conversations around potential manufacturing projects that might meet with Saudi approval,

including a project involving Rolls Royce and another involving manufacturing thermal batteries. By October 2011, Boyle believed that the Economic Offset Committee did not want to work with Al-Tassan. When asked why he did not tell Al-Tassan that the EOC expressed concerns about working with him, Boyle stated that he believed TSC could still develop a project with ASASCO and craft it in such a way that it would be viewed by Saudi Arabia as a TSC, and not an ASASCO, driven project.

**E. The Fifth Consulting Agreement**

While continuing to discuss offset projects, TSC and ASASCO entered into a fifth consulting agreement, effective September 1, 2011. Under the agreement, ASASCO was paid $500 per month, the same amount as the last agreement, to continue consulting on the sale of SFWs. The fifth consulting agreement was materially the same as the prior four with one key difference. The fifth agreement also contained an integration provision which asserted that each party waived the right to assert any claim against the other "based on any oral representations, statement, promise or agreement whether made before or after the date of this Agreement." Pl. Ex. 129 § 16. Al-Tassan read and initialed each page of the fifth consulting agreement. At the time Al-Tassan signed the fifth agreement, no one from TSC had told Al-Tassan that the company was contemplating terminating the OSA with

Blenheim. Al-Tassan also did not tell anyone from TSC that he had fled from Saudi Arabia.

### F. TSC Terminates the OSA

In November 2011, TSC acted on Fogarty's recommendation to terminate the OSA with Blenheim. On November 28, 2011, Boyle from TSC emailed a letter to Blenheim representatives stating that "[i]n recognition of recent changes to the offset guidelines in Saudi Arabia," TSC and Blenheim agreed to mutually terminate the OSA. Pl. Ex. 142; Def. Ex. 31. The letter was signed and accepted by Blenheim Capital on January 12, 2012. ASASCO does not dispute that by its terms, the Blenheim-ASASCO agreement also terminated when the OSA was terminated.

### G. Saudi Arabia Signs the Letter of Agreement

The United States government and Saudi Arabia executed a Letter of Agreement ("LOA") on December 24, 2011 whereby Saudi Arabia agreed to purchase SFWs from the United States. Boyamian emailed Al-Tassan to tell him the news about the agreement on January 3, 2012. The emailed stated: "Dear Mansour, Our brothers in Saudi Arabia, signed the LOA on December 24, 2011 at the Christmas eve, as a Christmas gift to us. CONGRATULATIONS to all of us." Pl. Ex. 143. The agreement finalized the terms of the sale of SFWs between the United States government and Saudi Arabia.

**H. Al-Tassan Believes Blenheim is "Out of the Picture"**

The parties dispute whether TSC told Al-Tassan that TSC and Blenheim had terminated the OSA. Boyle asserts that he told Al-Tassan about the termination in approximately February 2012, when they ran into each other at the Intercontinental Hotel in Abu Dhabi. Al-Tassan asserts that no one told him anything with regards to the termination of the OSA until September 2013. Nonetheless, on May 30, 2012, Al-Tassan emailed his assistant regarding a document Boyamian had sent to Al-Tassan. The email stated, in part:

> I have read the document and they have been advised in two options and I would push for the JV to make it more stronger for us. The issue of the SFW has not been resolved yet and I am still trying in many different ways carefully. If you recall our previous agreement calls for compensation – correct but through Blenheim, now Blenheim is out of the picture so, we don't know how to deal with it. Let's think how we can do it and satisfy both mutually.

Pl. Ex. 145; Def. Ex. 32. The same day, Shotwell responded:

> The Memorandum . . . provides Textron 2 options – the JV option and the TSO option. . . . I believe you should agree to the TSO option now but keeping the issue of the "Blenheim agreement" in the back-burner since as per their option the JV option would take time.
>
> I believe you need to get them into your hands now with the proposed TSO and accordingly start legal work in setting up of the proposed JV (offset?) option in anticipation of the required support/services agreement for the possibility of both the SFW and Shadow products to be classified as armaments. This way you can be properly compensation [sic] for all previous work done. <u>Perhaps the TSO can include a</u>

> budget item/s that really is/are your proposed
> compensation/s on any [Saudi Arabian] deal that would
> be closed. [8]

Pl. Ex. 145; Def. Ex. 32. Al-Tassan responded to Shotwell,

stating "I agree with you that we should tangle them with us in

any fashion under any arrangement while

we try slowly to get our fees as per the agreement with

Blenheim." Pl. Ex. 145; Def. Ex. 32.

### I. Extension of the Consulting Agreement

ASASCO and TSC signed an extension of the fifth consulting

agreement on August 16, 2012. The extension continued the terms

of the agreement through August 31, 2013. Throughout the fall of

2012, Al-Tassan continued to provide services for TSC, including

arranging meetings between Saudi officials and Textron's

Chairman Scott Donnelly at Boyamian's request. In October 2012,

Al-Tassan travelled to Wilmington, MA to meet with Boyamian and

others at TSC to discuss, among other things, the SFW

transaction. This was Al-Tassan's one in-person meeting with TSC

representatives in Massachusetts during the course of the TSC-

ASASCO business relationship. Neither party provides evidence of

what was specifically said during this meeting.

---

[8] The parties have not explained what TSO stands for.

### J. The Final SFW Supply Contract

The U.S. Department of Defense announced on August 20, 2013, that Textron Defense Systems, an affiliate of TSC, had been awarded a final contract to provide "1,300 cluster bomb units" to Saudi Arabia at a total price of $640,786,442. Pl. Ex. 153; Def. Ex. 35. The contract included $89.2 million as "Offset Execution Costs" – a portion of TSC's expected total offset obligations – on the understanding that TSC would be required to commit to a 40% offset obligation on the contract. Pl. Ex. 154; Def. Ex. 35; Pl. Ex. 8 at 185:14-188:5.

### K. TSC Does Not Renew Consulting Agreement

A few days later, on August 29, 2013, TSC notified ASASCO via email that TSC "elected not to offer a renewal" of the fifth consulting agreement, which was set to expire on August 31, 2013, and that TSC was "not aware of any outstanding obligations between the parties." Pl. Ex. 155; Def. Ex. 34. Al-Tassan did not respond to this email. Instead, in September 2013, he travelled to Boston, MA where he had dinner with Boyamian. At that dinner, Al-Tassan alleges that he asked Boyamian about the status of the offset obligation, and Boyamian told him TSC had gotten rid of Blenheim.

### L. Post-Script: TSC, Saudi Arabia, and Offsets

On June 9, 2014, a little less than a year after Textron Defense Systems was awarded the final SFW supply contract, Saudi

Arabia's Economic Offset Committee confirmed in a letter that TSC's offset commitment on the SFW sale would be 40% of the monetary value of the contract. The letter also stated that TSC's offset commitment of "forty percent (40%) will be formally included in the Offset Memorandum of Agreement which will be signed by Textron and EOP when the new Economic Offset Guidelines are issued by the EOC." Pl. Ex. 158; Def. Ex. 36. Subsequently, a U.S. Air Force Contracting Officer sent a letter to TSC stating: "The Government recognizes the agreement on the commitment rate of 40% and the U.S. Government will not be requesting a price adjustment concerning the offset value to the negotiated settlement on the subject contract." Pl. Ex. 159. Fogarty explained that this letter meant TSC would receive the full $640 million and would not have a downward adjustment in contract price due to any change in the assumed offset rate. To date, TSC and Saudi Arabia have not entered into an Offset Memorandum of Agreement. It is unclear whether TSC will ever have to fulfill an offset requirement for the SFW sale. TSC has retained the $89.2 million it received as part of the supply contract for offset costs – and has never paid it back.

To date ASASCO has not obtained a waiver of TSC's offset requirements from Saudi Arabia. Additionally, ASASCO has not delivered an offset project that has been accepted by Saudi Arabia to satisfy TSC's offset requirements.

## V. **Procedural History**

ASASCO filed its original complaint against TSC on July 15, 2015, alleging three counts: (1) breach of contract, (2) tortious interference, and (3) violation of Massachusetts General Laws, Chapter 93A (Docket No. 1). TSC filed a motion to dismiss (Docket No. 22), which the district court (Stearns, J.) converted into a motion for summary judgment (Docket No. 25). After allowing limited discovery, on March 11, 2016, the court issued a Memorandum and Order granting summary judgment in favor of TSC on all three counts (Docket No. 78).

On appeal, the First Circuit affirmed the district court's ruling dismissing ASASCO's breach of contract and tortious interference claims but reversed the Court's dismissal of ASASCO's Chapter 93A misrepresentation claim based on the failure of the contract claim. Arabian Support & Servs. Co. v. Textron Sys. Corp., 855 F.3d 1, 6-7 (1st Cir. 2017) ("ASASCO"). The First Circuit held that "ASASCO is entitled to proceed with its claim that TSC engaged in an unfair business practice by procuring ASASCO's agreement to low-fee consulting contracts with the promise of a future offset benefit, and then, after successfully signing the weapons deal, disclaiming any additional financial obligation to the Saudi company." Id. at 3. It added, "[I]f Textron did promise ASASCO offset related remuneration, but then terminated the OSA without providing

ASASCO an alternative means to obtain it, we see room for a viable Chapter 93A claim premised on Textron's misrepresentations." Id. at 7. Finally, it held that ASASCO should be given the opportunity to amend its complaint to supplement its Chapter 93A claim with any common law misrepresentation claims found in the record. Id. at 9.

On remand, the case was re-drawn to this Court. ASASCO filed an amended complaint containing six counts (Docket No. 107). TSC filed a motion for judgment on the pleadings (Docket No. 119), which the Court denied without prejudice (Docket No. 135). At the close of discovery, TSC moved for summary judgment on all counts (Docket No. 190).

## LEGAL STANDARD

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991) (quotation omitted). Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute precludes summary judgment if it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). An issue is "genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-

moving party," and "[a] fact is material if it has the potential of determining the outcome of the litigation." Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir. 2011) (quotation omitted).

The moving party is responsible for "identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). It can meet this burden either by "offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" Rakes v. U.S., 352 F. Supp. 2d 47, 52 (D. Mass. 2005) (quoting Celotex, 477 U.S. at 325). If the moving party shows the absence of a disputed material fact, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. "[C]onclusory allegations, improbable inferences, and unsupported speculation" are insufficient to create a genuine issue of material fact to survive summary judgment. Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009) (quotation omitted). When ruling on a motion for summary judgment, the court "view[s] the facts in the light most favorable to the party opposing summary judgment." Rivera–Colón v. Mills, 635 F.3d 9, 10 (1st Cir. 2011).

**DISCUSSION**

**I. Reasonable Reliance (Counts I – IV)**

ASASCO argues that TSC "made false representations to ASASCO regarding the amount and manner in which ASASCO would be compensated for assisting TSC in securing the SFW Transaction." Compl. ¶¶ 125, 134, 143. ASASCO further alleges that it "reasonably relied upon the false representations made by representatives of [TSC] by performing services and expending political capital to assist [TSC] in securing the SFW Transaction." Compl. ¶¶ 130, 139, 147. And ASASCO demands to be compensated with six percent of the total amount of SFW sales. Compl. ¶¶ 132, 141, 149. TSC contends that as a matter of law, ASASCO cannot have reasonably relied on the alleged promises made by Boyamian and other TSC representatives because of the express language of the five consulting contracts and the offset contract with Blenheim.

Under Massachusetts law, claims for fraudulent inducement, intentional misrepresentation, negligent misrepresentation, and promissory estoppel all require that the plaintiff reasonably and justifiably rely on the defendant's statement or promise. See First Marblehead Corp. v. House, 473 F.3d 1, 9 (1st Cir. 2006) (holding that negligent misrepresentation requires justifiable reliance); Kenda Corp. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 225 (1st Cir. 2003) (holding that fraudulent

inducement requires that the plaintiff reasonably rely on the misrepresentation); Coll v. PB Diagnostic Sys., Inc., 50 F.3d 1115, 1124 (1st Cir. 1995) ("An element of promissory estoppel is that the party invoking it must have reasonably relied on the alleged promise to his detriment." (quoting Hall v. Horizon House Microwave, 506 N.E.2d 178, 184 (Mass. App. Ct. 1987))); Kuwaiti Danish Comput. Co. v. Dig. Equip. Corp., 781 N.E.2d 787, 795 (Mass. 2003) (holding that fraudulent misrepresentation requires reasonable reliance).

A long-standing rule in Massachusetts "declares that reliance on supposed misrepresentations that contradict the terms of the parties' agreement is unreasonable as a matter of law." HSBC Realty Credit Corp. (USA) v. O'Neill, 745 F.3d 564, 571 (1st Cir. 2014) (citing Starr v. Fordham, 648 N.E.2d 1261, 1268 (Mass. 1995)). "[A] contractual provision flatly contradictory to prior oral assurances should cause most people —- and particularly experienced, knowledgeable businesspeople —- to pause." Turner v. Johnson & Johnson, 809 F.2d 90, 96 (1st Cir. 1986).

TSC's main argument is that a promise of a fee of six percent of the SFW transaction for assisting in the sale of the SFWs, if true, flatly contradicts the contractual provisions of all five consulting agreements. Specifically, the consulting agreements provide ASASCO "shall not receive any compensation or

commission based in any manner whatsoever on the volume of sales of the [TSC] products and/or services procured or received under this Agreement." Def. Ex. 4 § 4(c); <u>see also</u> Def. Exs. 5, 6, 18, 30. This contractual provision is consistent with the parties' understanding at the time they entered into the first consulting agreement in 2005 that Saudi Resolution 1275 prohibited commissions on the sale of munitions.  The provision undermines any reasonable reliance by ASASCO on any promise that the company would receive a six percent fee for securing the sale of SFWs.

In <u>Turner</u>, the First Circuit concluded that under Massachusetts law, a "plaintiff[] may not raise as fraudulent any prior oral assertion inconsistent with a contract provision that specifically addressed the particular point at issue" when "both parties were experienced in business and the contract was fully negotiated and voluntarily signed." 809 F.2d at 97. Al-Tassan, as an experienced businessman, read and reviewed each of the agreements before he signed them on behalf of ASASCO. ASASCO cannot now assert that it reasonably relied on promises of compensation in the form of a commission for assisting in selling the cluster bombs.

ASASCO contends that it reasonably relied on promises of extra compensation for offset services when its consulting fee was reduced from $10,000 a month to $500 a month, arguing that

TSC received valuable services for nominal value. The First Circuit addressed this issue when it reversed the earlier grant of summary judgment, offering: "Why Textron substantially reduced the consulting fee – and why ASASCO acquiesced to the reduction – also seem relevant, and potentially revealing, for ASASCO's claim that it was promised offset-related compensation outside of the consulting agreements." ASASCO, 855 F.3d at 9. The First Circuit suggested that "if [TSC] did promise ASASCO offset-related remuneration, but then terminated the OSA without providing ASASCO an alternative means to obtain it, we see room for a viable Chapter 93A claim premised on [TSC's] misrepresentations." Id. at 7. It understood TSC's promise as a "promised opportunity to perform offset services." Id. at 8 n.9.

When all reasonable inferences are drawn in its favor, ASASCO reasonably relied on TSC's promise that it would be compensated through its work on offsets, which TSC treated as a separate from the consulting services, going so far as to create "two books." Expecting remuneration through offsets, ASASCO entered into the ASASCO-Blenheim Agreement, which governed its compensation for offset-related services through 2011. ASASCO claims it was then blindsided when it learned in 2013 that the OSA between TSC and Blenheim was terminated without its knowledge. ASASCO asserts that it continued to work to provide offsets and consulting services between January 12, 2012 and

September 2013 in reliance on its belief that it would receive additional compensation via offsets.

The flaw in ASASCO's argument is that there is no evidence in the record that Al-Tassan was promised compensation of six percent of the total SFW sale for offset services even if ASASCO did not acquire a waiver or offset credits. While ASASCO and TSC were discussing proposed offset projects in 2006, Tom Harrington wrote to Al-Tassan that TSC was considering investing 5% of the value of the SFW contract into offset projects, but that "[a]ll such activity must result in Saudi Gov't approval of offset projects, grant credits/or waive requirement." Pl. Ex. 51. And while not finalized, the proposed TSC-ASASCO offset service provider agreement required ASASCO to provide either a waiver or credits to be compensated.

The parties formalized this understanding through the tripartite offset agreements in 2008 and 2009. Under the OSA there were only two ways for Blenheim to be paid for offset services: (1) if it obtained an irrevocable waiver of TSC's offset requirements or (2) if it developed an offset project that was approved by Saudi Arabia and generated offset credits. Blenheim would receive six percent of the value of the SFW supply contract, on a pro-rata basis, as offset credits were received. With respect to the waiver, Blenheim would receive either 2% or 6% of the value of the SFW contract. Under the

terms of the ASASCO-Blenheim Agreement, signed in April 2009, ASASCO would assist Blenheim in its efforts to either produce offset projects that were approved by Saudi Arabia to generate offset credits or help acquire an irrevocable waiver. Under either scenario, though, ASASCO would receive only 75% of any fee earned by Blenheim under the OSA.

ASASCO argues that TSC made a number of false representations to ASASCO before, during, and after the companies entered into the OSA and ASASCO-Blenheim agreements as to the exact fee it would receive for assisting in offsets. Regardless, the exact amount of the promised percentage fee for offset work is immaterial since ASASCO never produced either an irrevocable waiver or offset credits for TSC. Again, there is no evidence that TSC promised any fees for offset services unless ASASCO produced offset credits or a waiver. And there is no evidence that, even though TSC terminated the OSA, it interfered with ASASCO's efforts and opportunities to provide offsets or acquire a waiver. Quite to the contrary, even while TSC was contemplating terminating the OSA with Blenheim, it still wrote to the Saudi Economic Offset Committee, proposing Bexair (an Al-Tassan company) as an in-country offset service provider for the SFW sale. While the First Circuit was concerned that TSC was denying ASASCO the "opportunity" to provide offset services, the ultimate decision maker on offsets is the Saudi government, not

TSC. Whether TSC will have to provide offsets in the future is unknown. So there is no evidence TSC deprived ASASCO of the opportunity to provide offset services.

Accordingly, Defendant's motion for summary judgment will be allowed on Counts I, II, III, and IV.

## II. <u>Chapter 93A (Count VI)</u>

ASASCO contends that the center of gravity of TSC's deceptive acts was in Massachusetts because it is where the "entire course of misconduct and stringing along . . . emanated from." Docket No. 207 at 31. ASASCO further asserts that it is where Boyamian and other TSC officials had their offices, where key decisions were made, and where most communications – including proposed agreements and Boyamian's emails – originated from. TSC responds that ASASCO's Chapter 93A claim fails as a matter of law because the allegedly unfair or deceptive actions underlying the claims did not occur "primarily and substantially" within Massachusetts.

Chapter 93A prohibits anyone from engaging in "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a). To proceed on a 93A claim, the court must first "determine whether the center of gravity of the circumstances that give rise to the [93A] claim is primarily and substantially within the Commonwealth." <u>Kuwaiti Danish</u>, 781 N.E. 2d at 799.

TSC bears the burden of showing that any misconduct occurred primarily and substantially outside Massachusetts. <u>Roche v. Royal Bank of Can.</u>, 109 F.3d 820, 829 (1st Cir. 1997).

In <u>Roche</u>, the First Circuit identified three factors that are relevant to the determination: "(1) where defendant committed the deception; (2) where plaintiff was deceived and acted upon the deception; and (3) the situs of plaintiff's losses due to the deception." 109 F.3d at 829. The Court considers these factors, although the center of gravity analysis is not solely based on a formula "identified by any particular factor or factors" because a significant factor that exists in one case may not exist in another. <u>Kuwaiti Danish</u>, 781 N.E.2d at 798–99.

Where ASASCO was allegedly deceived, and the situs of its loss, plainly weigh in TSC's favor. The alleged oral misrepresentations by Mr. Boyamian upon which ASASCO says it relied occurred in Egypt, France, and Saudi Arabia. ASASCO is not located in the Commonwealth and did not incur its losses in the Commonwealth. It also did not receive or rely on the alleged misrepresentations in Massachusetts. During the ten-year period of the parties' business relationship, Al-Tassan only visited Massachusetts once, and then once after the relationship ended. ASASCO makes no allegations of any misrepresentations being made at those meetings.

ASASCO points out that TSC sent communications from
Massachusetts and its executive decision-making took place here.
ASASCO emphasizes that on September 9, 2008, Mr. Boyamian
forwarded a "crucial" email to Al-Tassan from Massachusetts that
the reason the consulting fee had been changed from $10,000 a
month to $0 a month was "because, TSC through Blenheim, an
offset service provider company based in UK, has an offset
service providing agreement with ASASCO for TSC business offset
requirements in Saudi Arabia." Pl. Ex. 93. Even if this email
could be interpreted as an effort to string ASASCO along with
the promise of offset compensation via the OSA, ASASCO was
afforded the opportunity to provide offset services through its
agreement with Blenheim. As to the other emails and decisions,
the core of the misleading conduct in question did not occur
primarily and substantially in Massachusetts. See Sonoran
Scanners, Inc. v. Perkinelmer, Inc., 585 F.3d 535, 546 (1st Cir.
2009) (finding the center of gravity was not in Massachusetts
when plaintiff received and acted upon the allegedly deceptive
statements in Arizona, and where its losses were incurred in
Arizona, but where the allegedly deceptive statements were
uttered in Massachusetts); Uncle Henry's Inc. v. Plaut
Consulting Co., 399 F.3d 33, 45 (1st Cir. 2005) (holding that an
alleged deceptive practice did not occur primarily and
substantially in Massachusetts when the misrepresentations were

received primarily in Maine and where their impact was primarily felt there).

In sum, the Massachusetts SJC's decision in "Kuwaiti Danish did not retreat from the proposition that, if the significant contacts of the competing jurisdictions are approximately in the balance, the conduct in question cannot be said to have occurred primarily and substantially in Massachusetts." Uncle Henry's, 399 F.3d at 45. Here, TSC has met its burden of demonstrating that the center of gravity is not in Massachusetts.

Defendant's motion for summary judgment will be allowed with respect to Count VI.

### III. Unjust Enrichment/Quantum Meruit (Count V)[9]

In its only remaining claim, ASASCO alleges that TSC unfairly used its services over a ten-year period to secure the SFW contract, all while paying ASASCO a nominal consulting fee and intentionally concealing that it had terminated the OSA with Blenheim. Quantum meruit is a theory of recovery and not an independent cause of action. See J.A. Sullivan Corp. v. Commonwealth, 494 N.E.2d 374, 377 (Mass. 1986), overruled on other grounds by G4S Tech. LLC v. Mass. Tech. Park Corp., 99 N.E.3d 728 (Mass. 2018). "The underlying basis for awarding quantum meruit damages in a quasi-contract case is unjust

---

[9] The parties barely briefed this issue. Also, the issue of disgorgement is mentioned in passing, so I do not discuss it.

enrichment of one party and unjust detriment to the other party." Salamon v. Terra, 477 N.E.2d 1029, 1031 (Mass. 1985). "The injustice of the enrichment or detriment in quasi-contract equates with the defeat of someone's reasonable expectations." Id. (quotation omitted).

Massachusetts law "does not allow litigants to override an express contract by arguing unjust enrichment." Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 130 (1st Cir. 2006). So to the extent that ASASCO argues TSC was unjustly enriched by being able to pay ASASCO a "nominal" consulting fee for securing the SFW sale, that claim is barred by the five consulting agreements as discussed above.

With respect to the promise of the opportunity to provide offset services, "[w]hile a party does not recover on the contract itself under quantum meruit, a court may look to the terms of the underlying contract to help determine appropriate recovery under quantum meruit." Liss v. Studeny, 879 N.E.2d 676, 682 (Mass. 2008). In this case, as discussed above, the terms of the ASASCO-Blenheim Agreement did not guarantee ASASCO payment as a percentage of the SFW transaction to compensate it for services in procuring the sale. Instead, ASASCO would receive compensation for the provision of either offset credits or a waiver. The terms of the ASASCO-Blenheim Agreement would not lead a reasonable person to believe that he was entitled to

compensation unless he provided such offset services. "As a general rule, the court will not grant quantum meruit recovery arising from a contingent fee contract where the contingency has not occurred." Liss, 879 N.E.2d at 682–83 (affirming that an attorney could not recover fees under quantum meruit where a contingency fee contract provided that the client would not be liable to pay compensation "except from amounts collected" and no amounts were ever collected).

When the offset compensation arrangement was designed, ASASCO bore the risk that it would be unable to provide either offsets or secure a waiver. There is no evidence in the record of specific offset work ASASCO performed or expenses it incurred in proposing offset projects after the OSA terminated in 2011, when Al-Tassan alleges he was working under the impression that OSA still was the governing agreement. Accordingly, ASASCO may not recover quantum meruit compensation for the provision of offset services.

Defendant's motion for summary judgment is allowed with respect to Count V.

**ORDER**

For the reasons stated above, the Court **ALLOWS** TSC's motion for summary judgment (Docket No. 190), **DENIES AS MOOT** the motions to strike (Docket Nos. 194, 196, and 221), and **DENIES** TSC's renewed motion for judgment on the pleadings (Docket No. 193).

SO ORDERED.

/s/ Patti B. Saris
Patti B. Saris
Chief United States District Judge